IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DILBAR GUL DILBAR a/k/a DILBAR GUL TAJ
ALI KHAN,

Defendant.

25-MR-6065-FPG

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE GOVERNMENT'S
MOTION TO REVOKE THE MAGISTRATE JUDGE'S RELEASE ORDER**

MICHAEL DiGIACOMO
United States Attorney
Western District of New York

Meghan K. McGuire
Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
100 State Street, Suite 500
Rochester, New York 14614
(585) 399-3922
Meghan.McGuire@usdoj.gov

This is not a typical visa fraud case.  The defendant was ineligible for an Afghan Special Immigrant Visa ("SIV") not only because he submitted fraudulent employment documentation but also because he was linked to the Haqqani Network, a designated Foreign Terrorist Organization.  The government was unable to proffer this information to Magistrate Judge Holland during the detention hearing.  Since that hearing, the government has either discovered or declassified information related to the defendant's background, including a prior arrest and associations with members of the Haqqani Network, and is presenting that information herein.

## FACTUAL BACKGROUND

While most Afghan citizens who assisted the United States and its allies during the war were true heroes, some were not.  Because it was difficult to perform reliable background checks, United States service members suffered numerous casualties from "insider attacks" committed by Afghan nationals who were thought to be friendly but were in fact working for insurgent forces.  Attached hereto as Exhibit A is an article from the Army Times, which explains the situation.

In 2009, the defendant worked as a translator in Afghanistan and was terminated from his position. The government has reason to believe that he was at that time and may still be a security risk.

According to the Terrorist Explosive Device Analytical Center ("TEDAC"), in 2011, the Department of Defense obtained evidence from a crime scene in Afghanistan.  One piece of evidence was a handwritten note.  The note contained a series of letters and numbers, possibly the coordinates of a planned terrorist attack.  The note was next to another piece of evidence that was also turned over to TEDAC.  The defendant's fingerprint was on the note.

1

That same year, the defendant was arrested for impersonating an Afghan National Police criminal investigator. The government does not know whether any charges stemmed from that arrest.

In 2013, the defendant applied for another interpreter position. His application was denied because of the 2011 arrest.

In 2018, the defendant had a series of contacts *via* Facebook with Mohammad Musa Khawrin. Musa was a former Member of Parliament in Afghanistan who was associated with Hezb-e Islami Gulbuddin. Musa and Musa's brother previously maintained connections with senior Taliban officials in Qatar. Musa also maintained ties to the Haqqani Network, held anti-American views, and was known to stoke anti-American sentiment in Afghanistan. Attached hereto as Exhibit B are the National Counterterrorism Center's descriptions of Hezb-e Islami Gulbuddin and the Haqqani Network. As of the date of his arrest, the defendant was still "friends" with Musa on Facebook.

In April 2024, the defendant entered the United States, moved to Rochester, New York, and obtained his green card. As previously noted, one of the first things the defendant did when he arrived was apply for a New York State license to act as a security guard. Given the defendant's past, this created an immediate concern.

Law enforcement could not immediately arrest the defendant because (1) it needed to collect the evidence that would prove he obtained his Afghan SIV, admission to the United States, and green card all through fraud and (2) there was a national security interest in determining whether the defendant was associating with terrorists or other criminals while in the United States. Law enforcement had to carefully balance the risk of allowing the defendant to remain out of custody against the need to investigate his past and current

activities. Thus, the Federal Bureau of Investigations ("FBI") Joint Terrorism Task Force ("JTTF") opened an investigation. (*See* Complaint, Dkt. 1, ¶ 1 (identifying the affiant as a member of the FBI's JTTF).)

The JTTF's investigation has since uncovered the evidence outlined in the Criminal Complaint, which clearly demonstrates that the defendant obtained his Afghan SIV, admission to the United States, and a green card all through fraud.

The investigation also revealed that the defendant has continued to be in contact with a person on Facebook that law enforcement believes is the same person who identified himself as "Ray James" and falsified the defendant's second letter of employment. Prior to the defendant's arrival, the defendant sent "Ray James" a United States government-issued ID Badge with the defendant's brother's picture and identifying information. To the government's knowledge, that brother was still in Afghanistan at the time. Since arriving in the United States, the defendant sent "Ray James" a picture of an account and routing number (a known practice that criminals use to make discrete payments, including international payments).

## **PROCEDURAL HISTORY**

On April 29, 2025, the defendant was arrested and charged by criminal complaint with committing visa fraud in violation of Title 18, United States Code, Section 1546(a). At the initial appearance, the government moved to detain the defendant under Title 18, United States Code, Section 3142(f)(2)(A), on the grounds that there is a serious risk of flight.

The Magistrate Judge held a detention hearing on May 9, 2025, and both the government and the defendant proceeded by proffer. The government argued that each of the

"Section G" factors set forth in Title 18, United States Code, Section 3124(g) weighed in favor of detention.

With respect to the third Section G Factor—the history and characteristics of the defendant—the government focused on the defendant's lack of connections to the Western District of New York and strong incentive to flee to avoid deportation of himself and his immediate family members.  (Transcript of May 9, 2025 Detention Hearing ("5/9/25 Tr.") at 9-12.)  The government could not provide any information regarding the defendant's criminal history and affiliation with the Haqqani Network at that time because it was still classified.

With respect to the fourth Section G factor— the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release—the government said the following: "All I can say with respect to that, is that, again, the VISA program has extensive vetting procedures for a reason. When people lie to avoid those vetting procedures, they are inherently placing our country at risk."  (*Id.* at 12:16-20.)  To clarify, the Magistrate Judge asked the government, "[a]re you arguing that [the defendant] poses a risk to the safety of the community or any other person?"  (*Id.* at 13:10-12.)  The government responded, "I cannot give you any information on that right now, no."  (*Id.* at 13:13-14.)

In its proffer, the defense inaccurately stated that the defendant "has no prior criminal history whatsoever."  (*Id.* at 28:9-10.)[1]  The Magistrate Judge took the parties' arguments under advisement until May 13, 2025, when she issued an oral decision releasing the

---

[1] This is not to suggest that defense counsel was intentionally misrepresenting the defendant's criminal history to the Magistrate Judge.  Rather, it is to say that the defendant misrepresented his criminal history to his attorney and then allowed his attorney to repeat that misrepresentation in Court.

defendant under certain conditions.  (Dkt. 9.)  The Magistrate Judge agreed that "the government [] met its burden to demonstrate by a preponderance of the evidence that there [was] a serious risk that [the defendant would] flee."  (Transcript of May 13, 2025 Continuation of the Detention Hearing ("5/13/25 Tr.") at 6:16-18.)  However, she ultimately concluded that certain conditions would adequately assure the defendant's appearance at future proceedings.

In the course of issuing her decision, the Magistrate Judge placed significant weight on what she characterized as a lack of criminal history, violence, and association with violent organizations by the defendant.  In discussing the first Section G Factor, the Magistrate Judge stated that, "VISA fraud is not a violent crime," (*id.* at 10:21-22) and referenced the defendant's "lack of any criminal history" when opining on the potential sentence that would be recommended under the Sentencing Guidelines (*id.* at 11:3).[2]

The Magistrate Judge directly addressed the defendant's criminal history when discussing the third Section G Factor, which she found to be "the most significant in [her] analysis."  (*Id.* at 11:17.)  In her recitation of the defendant's history and characteristics, the Magistrate Judge asserted that the defendant had "no criminal history."  (*Id.* at 11:19-21.)

Then, when discussing the fourth Section G Factor, the Magistrate Judge accurately noted that, "there is a danger inherent in VISA fraud because it deprives the United States of information it needs to make informed admission decisions and allows in individuals who have not been appropriately vetted."  (*Id.* at 12:24-13:3.)  She then asserted that the defendant

---

[2] Again, this is not meant to suggest that the Magistrate Judge misstated the evidence that was in the record before her.  The government was unable to present the Magistrate Judge with evidence of the defendant's criminal history and ties to the Haqqani Network during the detention hearing because it was still classified at that time.

"has no noted history of violent conduct, nor ties to any violent individuals or organizations." (*Id.* at 13:4-6.)

In reaching her ultimate conclusion, the Magistrate Judge emphasized that she placed particular emphasis on the defendant's lack of a criminal history. (*Id.* at 13:11-12.) Thus, she ordered his release pursuant to certain conditions, which will be discussed in greater detail below.

On May 14, 2025, the government filed its Notice of Motion and Motion for revocation of the Magistrate Judge's Release Order. (Dkt. 10.) Since that time, the government has worked diligently to declassify certain information relevant to the defendant's history and characteristics and potential dangerousness upon release. In doing so, the government and law enforcement must balance the cost of declassifying information and potentially impeding other ongoing criminal investigations and national security efforts against the benefit of hopefully securing the defendant's detention.

## DISCUSSION

In the Magistrate Judge's oral decision, she appears to have found that the nature and seriousness of the offense, the defendant's history and characteristics, and the danger to the community all weighed in favor of release. However, given the newly declassified information, all three of these factors now tip firmly in favor of detention. Thus, after performing a *de novo* review of the full record, this Court should revoke the Magistrate Judge's Release Order and detain the defendant pending the resolution of this case.

Regarding the first Section G Factor, the defendant has repeatedly minimized the seriousness of visa fraud by claiming that, if convicted, the Sentencing Guidelines would only recommend a term of imprisonment of 0-6 months. However, if the proof ultimately shows

6

that the defendant committed visa fraud to facilitate an act of international terrorism, then his maximum potential sentence increases from 10 years to 25 years.  18 U.S.C. § 1542. Similarly, if the proof ultimately shows that the defendant committed visa fraud in order to conceal his membership in the Haqqani Network or in furtherance of some other offense, then the Sentencing Guidelines' recommended term of imprisonment will be substantially higher. *See* USSG § 2L2.2(b)(4) and (c).

Regarding the third and fourth Section G Factors, the Court now knows that the defendant has a past arrest, that his fingerprint was found on an incriminating piece of evidence at a crime scene in Afghanistan, and that the defendant has connections to the Haqqani Network.  This suggests that the defendant is not in the United States because he wants a better life for himself and his family.[3]  Given that, his incentive to either flee or accomplish some other criminal objective before he is convicted, sentenced, and eventually deported is even stronger.  The defendant's release is an ongoing national security risk.

1)  *The Current Conditions of Release Are Insufficient to Reasonably Assure the Defendant's Appearance and/or the Safety of the Community*

If the defendant decides that he wants to flee, either with or without his family, none of the proposed conditions will stop him.  Some of the weaknesses of the proposed conditions are outlined below.

---

[3] In fact, while the defendant has portrayed himself as a dedicated family man, it took him six days to call his wife from jail.  The defendant was arrested on May 1, 2025, but did not call his wife until May 7, 2025.  He also did not call the individual who is currently serving as a third-party custodian—who has been characterized by the defense as extended family—until May 10th, 9 days after the defendant was arrested.

In contrast, the defendant called Subject A twice the day he was arrested and once the day after.  He called another associate once on May 1st, the day he was arrested, once on May 2nd, once on May 3rd, three times on May 6th, and once again on May 10th.

a. *Cash Bond* - The defendant represented to the Magistrate Judge that $6,000 constituted his entire life savings. However, based on a review of the defendant's cell phone, it appears that he has access to cash here in the United States.[4] Attached hereto as Exhibit C is an image depicting large piles of cash, which was found on the defendant's phone. According to the metadata, it was taken on January 16, 2025, at a particular address in Rochester, New York. The individual who lives at that address ("Subject A") is also an Afghan national. During the execution of the warrant at the defendant's home, law enforcement recovered a MoneyGram receipt showing a transfer of money from Subject A to Afghanistan in March 2025.[5]

b. *Surrender of Passports and Prohibition Against Obtaining Additional Travel Documents* - The defendant has connections who can obtain fraudulent identification documents for him and his family. He has already used these connections to get into the United States and can use them again to either flee to another country or disappear within the United States (which does not require a passport).

---

[4] Another example of the defendant's access to cash is the fact that, when law enforcement searched the defendant's residence, they seized his cell phone, which was a top-of-the-line iPhone 16 Pro Max. His wife also had an iPhone. During the execution of the search warrant at the defendant's residence, law enforcement found Apple Store receipts, both dated January 16, 2025. The first receipt was for two iPhone 16 Pro Max 256GB Desert Titanium devices, each costing $1,199. The second receipt was for two Apple Watch Ultra 2 GPS - Cellular 49mm Black Titanium Case with Black Titanium Milanese Loop devices, each costing $899. In total, the receipts evidence over $4,000 in spending in one day.

According to USPO, immediately upon paying the $6,000 cash bond and being released, the defendant was able to purchase two new Android cell phones for himself and his wife.

[5] Also in the defendant's residence, law enforcement recovered airline tickets, itineraries, baggage receipts, and boarding passes in Subject A's name that indicated Subject A traveled back to Afghanistan between January and March of 2025.

  c. *Home Detention* - Home detention is typically not a condition that is imposed to address risk of flight precisely because it does nothing to prevent flight.  If the defendant wants to flee, all he needs to do is cut his monitoring bracelet and flee.

  d. *Disclosure of Financial Information* - The effectiveness of this condition relies in large part on the defendant's voluntary disclosure of his financial records to the USPO.  But the defendant has already proven an unwillingness to be forthcoming about his finances.  In the Bail Report, the defendant only disclosed a checking account, a savings account, and a single credit card.  He did not disclose that he has accounts with Coastal Community Bank (OnePay), PayPal (Venmo), GreenDot (Apple Cash), and Goldman Sachs (Apple Credit).  Moreover, USPO's financial monitoring will not capture any transactions the defendant makes using MoneyGram, Western Union, or a hawala[6] to send or receive money while on pretrial supervision.

  e. *Irrevocable Waiver of Extradition* - "[W]aivers of extradition . . . are meaningless, especially as applied against a country with which the United States has no operative extradition treaty."  *United States v. Fishman*, No. 1:20-CR-160 (MKV), 2020 WL 6365353, at *1 (S.D.N.Y. Oct. 29, 2020).  "Moreover, there is nothing to prevent [a defendant] from withdrawing that waiver, despite his claiming it is 'irrevocable.'"  *Id.  See also United States v. Kouchekzadeh*, 2008 WL 1902434, at *3 (W.D.N.Y. Apr. 28, 2008) ("[A] waiver of extradition is not valid until an extradition request is actually pending.... Before that, it is subject to

---

[6] The hawala system refers to an informal channel for transferring funds from one location to another through service providers—known as hawaladars—regardless of the nature of the transaction  and  the  countries  involved.  (Source: https://www.imf.org/external/pubs/ft/fandd/2002/12/elqorchi.htm, last visited 5/27/25.)

withdrawal. Since an extradition request will not be made until the defendant refuses to appear, his offer to waive extradition at this time is of little value.").

     f.    *Computer Internet Monitoring Program* - This condition permits the USPO to install monitoring software on any of the defendant's internet-accessible devices.[7] USPO then monitors a defendant's internet activity using certain key words that alert them to potentially violative activity. This monitoring process works well in cases involving child pornography. It will do nothing in this case. First, the majority of the defendant's electronic communications are in Pashto, and it is unclear whether the USPO has any mechanism for monitoring or translating languages other than English. Second, even if the defendant happens to be planning either his flight or future criminal activity in English, it is impossible to generate key words that would effectively notify the USPO of that activity.

---

[7] The condition relies upon the defendant to disclose the existence of such devices.

## CONCLUSION

Based on the foregoing, the government respectfully requests that the Court revoke the

Magistrate Judge's Release Order and detain the defendant pending the resolution of this

case.

DATED: May 27, 2025

MICHAEL DiGIACOMO
United States Attorney
Western District of New York

By:_*Meghan K. McGuire*_____

Meghan K. McGuire
Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
100 State Street, Suite 500
Rochester, New York 14614
(585) 399-3922
Meghan.McGuire@usdoj.gov

11